John E. ASHLEY et al.

v.

Kenneth A. KEHEW et al.

No. 2008–264–Appeal.

Supreme Court of Rhode Island.

April 28, 2010.

Quentin G. Anthony, Esq., for Plaintiff.

Kenneth R. Tremblay, Esq., (Kenneth & Mary Ellen Kehew), Kevin P. Gavin, Esq., Portsmouth, (Town of Portsmouth), for Defendant.

Present: SUTTELL, C.J., GOLDBERG, FLAHERTY, and ROBINSON, JJ.

## OPINION

Justice FLAHERTY, for the Court.

The central issue before the Court in this appeal is whether restrictive covenants, which are set forth in instruments of conveyance, and which prohibit a further subdivision of two lots in the Town of Portsmouth, remain enforceable. A Superior Court justice ruled that the restrictions no longer were enforceable because all parties had agreed to release them. The owners of one of the two lots in the subdivision appealed. We vacate the judgment.

## I

### Facts and Travel

In 1982, Lucille Ashley deeded lot No. 20 on Assessor's Plat No. 64 in Portsmouth to her granddaughter, Laure Ashley. Subsequently, and for reasons not necessary to decide this appeal, Franklyn Ashley, Laure's father, and John Ashley, Laure's brother, filed suit in Newport County Superior Court against Laure, challenging the conveyance. In 1986, the parties reached a settlement that was approved by the Superior Court. Per the terms of the settlement, which was included as part of a consent judgment entered by the Superior Court, Laure agreed to subdivide lot No. 20 and give John title to "the farm house" on lot No. 20, along with 2.54 acres of land. Laure retained the balance of lot No. 20, roughly five acres.[1] However, in a separate agreement, Laure agreed to convey those same five acres to her attorney, Daniel McKinnon, to satisfy legal fees that she owed to him.

To effectuate the consent judgment, a subdivision application was submitted to the Portsmouth Planning Board (the board) in 1988 designating two discrete lots: lot No. 1, which measured about five acres, and lot No. 2, which was about two and a half acres.[2] However, the initial plan was not acceptable to the board; it required that amendments be made, including that two conditions be imposed on

---

1. As part of the settlement, Franklyn's and John's claims against Laure were dismissed.

2. Although lot No. 1 was not deeded to McKinnon until July 12, 1991, and the deed was not recorded until September 13, 1991, he is designated as the "owner" on the site plan submitted to the board, and it appears from the record that he was an interested party throughout the entire municipal process.

both lots. Those conditions were that "Lots No. 1 & No. 2 May Not Be Further Subdivided" and "Not More Than One Single Family Home With Normal Outbuildings Shall Be Constructed On Each Lot." McKinnon and Laure agreed to the conditions, and the board eventually approved a subdivision plat that included both conditions on the face of the plat.

In June 1990, Laure executed a quitclaim deed to lot No. 2 to John, which included both of the aforementioned conditions imposed by the board. For some reason, the deed was not recorded in the land evidence record until July 11, 1995. To complicate matters further, at trial, John denied any knowledge of this deed.

When Laure conveyed lot No. 1 to McKinnon in 1991, the quitclaim deed contained the identical covenants found in Laure's 1990 deed to John. ("Said lot may not be further subdivided" and "Not more than one single family home with normal outbuildings shall be constructed on said lot.") The deed to McKinnon was recorded on September 13, 1991.

Then, on June 4, 1996, Laure executed and later recorded what was denominated as a "Confirmatory Quitclaim Deed" to lot No. 2 to John Ashley and Cheryl Beach. That deed contains the same two conditions as the 1990 deed from Laure to John, i.e., "Said lot may not be further subdivided" and "Not more than one single family home with normal outbuildings shall be constructed on said lot." But on that same day, Laure also executed an "Affidavit and Release," which was recorded with the confirmatory quitclaim deed. That document reiterated the same two restrictions but then said that:

"This language was included in the deeds because the Town of Portsmouth has imposed these conditions on the use of the aforementioned property and because these conditions appear on the subdivision plan referred to in said deeds. It was not and is not my intention to burden the aforementioned premises with these restrictions, and, to the extent that I have the authority, I hereby release John E. Ashley and the premises from said conditions."

The confirmatory deed also declared that it is "subject * * * to the terms and conditions of the Affidavit and Release."

On June 19, 2001, McKinnon executed a warranty deed conveying lot No. 1 to himself and John B. Harwood as tenants in common. That deed provided that lot No. 1 was "[s]ubject to restrictions put on the face of the above plan imposed by the Town of Portsmouth but released by these grantors." On that same day, McKinnon and Harwood executed a warranty deed for the same premises to Kenneth and Mary Ellen Kehew. This deed also contained the provision that lot No. 1 was "[s]ubject to restrictions put on the face of the above plan imposed by the Town of Portsmouth but released by these grantors." Both deeds were recorded on July 9, 2001.

Shortly thereafter, the Kehews applied to the Portsmouth Planning Board to subdivide lot No. 1 so that Mr. Kehew's brother could build a home. It appears that their initial application was withdrawn, but in 2005 another application was submitted in its stead. The board approved the Kehews' application to subdivide the property, and it agreed to rescind the condition that it had previously imposed prohibiting any further subdivision of either lot No. 1 or lot No. 2.[3]

---

3. John Ashley and Cheryl Beach represented in their appeal to this Court that the board's action in rescinding the conditions was being appealed. The status of that appeal is unknown at this time.

On March 8, 2005, John Ashley and Cheryl Beach filed a complaint in Newport County Superior Court against the Kehews, seeking injunctive relief. Specifically, they asked that the Kehews "be permanently enjoined and restrained from presenting to the Portsmouth Planning Board an application to subdivide Lot No. 1 into 2 lots, subdividing Lot No. 1 into 2 lots and erecting or permitting a third person to erect a residential dwelling on said lot."[4]

After a trial without a jury, the trial justice issued a decision. After summarizing the essential facts surrounding the three purported releases by Laure Ashley, by McKinnon and Harwood, and by the board, the trial justice articulated the law upon which she relied in reaching her decision. She observed that restrictive covenants can be discharged either through releases or agreements. Then she commented that "several jurisdictions have held that the consent of all owners is required to release a subdivision's restrictions" and cited three cases for this proposition: *Flowers v. August*, 426 S.W.2d 480, 482 (Ky.1968); *Dartmouth–Willow Terrace, Inc. v. MacLean*, 371 S.W.2d 937, 938 (Ky.1963); *Truong v. City of Houston*, 99 S.W.3d 204, 214 (Tex.Ct.App.2002).

The trial justice went on to hold that:

"The credible evidence demonstrates that all the parties agreed to the release of the original restrictions, albeit not simultaneously. Since the lot owners by 'mutual agreement' have 'released and relinquished their right to enforce the same' the restrictions in controversy are no longer enforceable. *See Dartmouth–Willow Terrace*, 371 S.W.2d at 938."

The trial justice found that the board had released the restrictions on the subdivision plat in 2005, that McKinnon had released the restrictions on lot No. 1 through his deed to Harwood and himself and then "reinforced that release" via his deed to the Kehews, and that lot No. 2 was released from the restrictions by the 1996 confirmatory quitclaim deed and affidavit and release signed by Laure. The trial justice entered a judgment denying John Ashley and Cheryl Beach's claim for injunctive relief to enforce the restrictive covenants.

John Ashley and Cheryl Beach timely appealed to this Court. On appeal, we must resolve whether the restrictions remain in effect or whether they effectively were released by the respective parties.

## II

### Standard of Review

■ "A judgment in a nonjury case will be reversed on appeal when it can be shown that the trial justice misapplied the law, misconceived or overlooked material evidence or made factual findings that were clearly wrong." *Ondis v. City of Woonsocket ex rel. Touzin*, 934 A.2d 799, 802 (R.I.2007) (quoting *Town of West Greenwich v. A. Cardi Realty Associates*, 786 A.2d 354, 357–58 (R.I.2001)). When

---

4. Prior to the filing of this complaint, John Ashley, Cheryl Beach, Timothy Banks, and several other plaintiffs filed a complaint in 2003, also in Newport County Superior Court, seeking a declaratory judgment that Selina Lane, the road on which lots No. 1 and No. 2 are situated, was a private road, not a public road. The trial justice consolidated both cases for purposes of trial. The trial justice concluded that Selina Lane was a public road. Timothy Banks, a plaintiff in that action and an owner of property on Selina Lane, appealed the trial justice's decision to this Court. This Court was evenly divided on whether Selina Lane was a private or public road. That being the case, the trial justice's decision was affirmed. *Ashley v. Kehew*, No.2008–265–A., 992 A.2d 1013 (R.I., filed April 28, 2010) (mem.).

we examine the record, "[w]e review with deference the factual findings made by a trial justice in a nonjury case." *State v. Germane*, 971 A.2d 555, 573 (R.I.2009). When, as is the case here, the issue is a pure question of law, our review is *de novo. Ondis*, 934 A.2d at 802.

## III

### Analysis

We recognize at the outset that Rhode Island law is relatively scant on what constitutes an effective release of a restrictive covenant. Previously, when faced with an issue about the enforceability of a restrictive covenant when a Rhode Island law was unclear or sparse, we have looked "to leading authorities and the law of other jurisdictions for guidance in making our determination." *Ridgewood Homeowners Association v. Mignacca*, 813 A.2d 965, 972 (R.I.2003) (quoting *Liberty Mutual Insurance Co. v. Harbor Insurance Co.*, 603 A.2d 300, 302 (R.I.1992)); *cf. Jackvony v. Poncelet*, 584 A.2d 1112, 1116 (R.I.1991) ("No case law exists in Rhode Island that directly addresses the precise issue now before us. Consequently we must look to the general law dealing with the extinguishment of easements and to any other jurisdictions that have ruled on the issue."). We do so here as well.

Covenants can be terminated by merger, release, rescission, unclean hands, acquiescence, abandonment, laches, and estoppel. 9 Richard R. Powell, *Powell on Real Property* § 60.10[1] at 60–120 (Michael Allan Wolf ed., LexisNexis Matthew Bender 2009). "A person entitled to enforce the benefit of a covenant may extinguish this right by means of a written and recorded release." *Id.* at 60–122. "Such a release, however, extinguishes the obligation only so far as it relates to the estate of the releasor, and all of the benefited property owners must join in a release in order to completely extinguish the obligation." *Id.*

When we review a document that purports to release rights, this Court is "governed by the 'well-settled rules on the interpretation of contracts.'" *McBurney v. Teixeira*, 875 A.2d 439, 443 (R.I.2005) (quoting *W.P. Associates v. Forcier, Inc.*, 637 A.2d 353, 356 (R.I.1994)). If the terms of the release are clear and unambiguous, "the task of judicial construction is at an end and the agreement must be applied as written." *Id.* To determine if a release is clear and unambiguous, we view "the document * * * in its entirety and [give] its language * * * its plain, ordinary and usual meaning." *Id.* A release is ambiguous only if "it is reasonably and clearly susceptible to more than one interpretation." *Id.*

We carefully have scrutinized what purports to be the releasing language in the deeds and other instruments related to the various conveyances. After doing so, it is our opinion that John Ashley and Cheryl Beach, as the owners of lot No. 2, never released their right to enforce the restrictions against further subdivision placed upon lot No. 1. In our view, the trial justice clearly was wrong when she concluded "that all parties agreed to the release of the original restrictions." It may be accurate to say that all parties released, or attempted to release, their own properties from the restrictions, but that is not the same as relinquishing one's right to enforce the restrictions on another lot.

We do not agree with the trial justice's reliance on the *Truong, Flowers*, and *Dartmouth–Willow Terrace* cases. There are obvious and critical factual distinctions between those cases and the situations confronting us in this appeal. For example, in *Truong*, 99 S.W.3d at 214–15, individual owners in a subdivision executed written releases in accordance with the terms of a

deed restriction document. In *Flowers*, 426 S.W.2d at 482, all owners in a subdivision collectively signed a release lifting the restrictions for just a single lot. And in *Dartmouth–Willow Terrace*, 371 S.W.2d at 938, the two holders of the right to enforce a restriction executed deeds to the burdened estate holder and released any rights they had to enforce the restriction.

The aforementioned cases all involved situations in which the owners of the estate that benefited from the restrictions executed documents that explicitly lifted the restrictions on the burdened estate(s). For example, in *Flowers*, 426 S.W.2d at 482, the release stated, in relevant part, "IT IS NOW AGREED by all of the owners of property in the Spring Hill Subdivision that such portion of the [three specific] restrictions * * * shall be deleted, and shall no longer be a portion of the restrictions upon said Spring Hill Subdivision * * *." Similarly in *Dartmouth–Willow Terrace*, 371 S.W.2d at 938, the two owners who held the right to enforce a restrictive covenant executed quitclaim deeds to the burdened estate holder "releasing any rights which they might have to enforce the restrictions."

This is not the situation facing us as we endeavor to resolve the issues in this case. Here, we have purported releases from the owners of lots No. 1 and No. 2 but neither specifically states that the owners waive their right to enforce the restrictions on the adjacent lot or even refers to their right to enforce the restriction on the other lot.

■ McKinnon's intent to release the restrictions in the 2001 deed to himself and Harwood and the subsequent deed by them to the Kehews both contain a provision that lot No. 1 was "[s]ubject to restrictions put on the face of the above plan imposed by the Town of Portsmouth but released by these grantors." The lan-

guage "but released by these grantors" must be viewed as an attempt to free lot No. 1 from the restriction. This attempted release, however, cannot be effective to remove the restriction on lot No. 1 because the owners of the burdened estate, lot No. 1, cannot unilaterally release themselves from a condition that burdens their estate. Only the owner of the estate benefiting from the covenant, in this case lot No. 2, can release the burdened estate. *See Leverton v. Laird*, 190 N.W.2d 427, 432–33 (Iowa 1971) ("Except as to the releasing parties themselves, the releases could not affect the rights created by the dedication.") (citing *Beeler Development Co. v. Dickens*, 254 Iowa 1029, 120 N.W.2d 414, 417 (Iowa 1963)); *Albright v. Fish*, 136 Vt. 387, 394 A.2d 1117, 1121 (1978) ("A release extinguishes only the estate of the releasor."); 9 *Powell on Real Property* § 60.10[1] at 60–122. Therefore, McKinnon and Harwood's attempt to release the restrictions had no impact on the rights of the owners of lot No. 2 to enforce the restrictive covenant prohibiting further subdivision of lot No. 1.

Likewise, Laure Ashley's 1996 affidavit and release that was recorded with the so-called confirmatory deed to lot No. 2 failed to affect the rights of the owners of lot No. 2 to enforce the restrictive covenants burdening lot No. 1. This document reiterates the two conditions placed upon the land and with reference to these conditions provides that:

"This language was included in the deeds because the Town of Portsmouth has imposed these conditions on the use of the aforementioned property and because these conditions appear on the subdivision plan referred to in said deeds. It was not and is not my intention to burden the aforementioned premises with these restrictions, and, to the extent that I have the authority, I here-

by release John E. Ashley and the premises from said conditions."

This document merely is an attempt to unburden lot No. 2 from the two conditions and it cannot operate to divest the owner of lot No. 2 of the right to enforce the restrictive covenants placed upon lot No. 1. In our analysis, the plain meaning of this document refers to lot No. 2 only; no reference is made to lot No. 1 or to any other property. *See McBurney*, 875 A.2d at 443. The Kehews argue that the use of the plural "deeds" and "premises" in the document refers to the deeds to lot No. 1 and lot No. 2, and therefore is indicative of Laure's intent to release lot No. 1 from the conditions. In our view, that is not a reasonable interpretation of the document. After considering the document in its entirety, we believe that "deeds" refers to the two deeds from Laure to John, the 1990 quitclaim deed and the 1996 confirmatory quitclaim deed, and that "premises" refers only to lot No. 2.

The board's 2005 decision to rescind the two conditions that it imposed on the subdivision plat does not alter our conclusion. This is so because, irrespective of the board's action, the owners of lot No. 2 had a right to rely on the restrictions set forth in the subdivision plat and contained in Laure Ashley's 1991 deed to McKinnon. This certainly is consistent with our prior holdings. *See Ridgewood Homeowners Association*, 813 A.2d at 971 (providing that "this Court has recognized that owners may enforce restrictive covenants on land burdened by the same restrictions as their land, when the purpose of the covenants is to maintain a common scheme of development"); *Houlihan v. Zoning Board of Review of New Shoreham*, 738 A.2d 536, 538 (R.I.1999) ("recogniz[ing] that when recorded plat-lot restrictions appear intended to provide for a uniform development and use of platted subdivision lots, any one of the plat-lot owners may seek judicial assistance to compel compliance by another lot owner with the restrictive covenants"); *Farrell v. Meadowbrook Corp.*, 111 R.I. 747, 750, 306 A.2d 806, 808 (1973); *Emma v. Silvestri*, 101 R.I. 749, 751–52, 227 A.2d 480, 481 (1967); *Noonan v. Cuddigan*, 85 R.I. 328, 333, 131 A.2d 241, 244 (1957) ("It is well settled that where, in conformity with a general plan for development, the owner of property divides it into building lots and places upon them uniform restrictions, any subsequent owner may enforce the restrictions against any other grantee or present owner of such lots."). It is clear to us that the record owners of lot No. 2 have never relinquished their right to enforce the covenants benefiting them.

In the absence of a valid release we will give effect to the restrictive covenant. In doing so, "[w]e construe the terms of any restrictive covenant 'in favor of the free alienability of land while still respecting the purposes for which the restriction was established.'" *Martellini v. Little Angels Day Care, Inc.*, 847 A.2d 838, 843 (R.I.2004) (quoting *Gregory v. State Department of Mental Health, Retardation and Hospitals*, 495 A.2d 997, 1000 (R.I.1985)). This Court "will not * * * seek ambiguity where none exists but rather we will effectuate" the restrictive covenant's objective. *Ridgewood Homeowners Association*, 813 A.2d at 972 (quoting *Hanley v. Misischi*, 111 R.I. 233, 238, 302 A.2d 79, 82 (1973)). "Moreover, in those instances when the limitation in issue is unambiguous, restrictive covenants are to be strictly construed." *Martellini*, 847 A.2d at 843 (citing *Hanley*, 111 R.I. at 238, 302 A.2d at 82). Here, the meaning of the restrictive covenant is undisputed; by its terms it prohibits further subdivision. John Ashley and Cheryl Beach, as owners of lot No. 2, never released their right to

prohibit further subdivision of lot No. 1, and, therefore, retain their right to enforce the covenant.

## IV

### Conclusion

For the reasons stated in this opinion, the Superior Court's judgment is vacated and the record is remanded to the Superior Court for entry of judgment for the plaintiffs John Ashley and Cheryl Beach.