UNPUBLISHED ORDER
Not to be cited per Circuit Rule 53

In the

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois  60604**

Argued April 13, 2005
Decided August 10, 2005

**Before**

Hon. WILLIAM J. BAUER, *Circuit Judge*

Hon. DIANE P. WOOD, *Circuit Judge*

Hon. ANN CLAIRE WILLIAMS, *Circuit Judge*

No. 04-3533

| | |
|---|---|
| CROSSPOINT SEVEN, INTECH PARTNERS ONE, INTECH PARTNERS ELEVEN, | Appeal from the United States District Court for the Southern District of Indiana, Indianapolis Division. |
| *Plaintiffs-Appellants,* | |
| *v.* | No.  02 C 1731 |
| MANUFACTURERS LIFE INSURANCE COMPANY, | John Daniel Tinder, *Judge*. |
| *Defendant-Appellee.* | |

**O R D E R**

Appellants Crosspoint Seven, LLC, Intech Partners One, LLC and Intech Partners Eleven, LLC sued The Manufacturers Life Insurance Company (U.S.A.) ("Manulife"), claiming that Manulife anticipatorily breached its contract with the appellants' umbrella company, the Lauth Property Group.  The district court granted summary judgment in favor of Manulife, and held that neither party's behavior created a genuine issue of material fact that Manulife repudiated the contract.  We affirm, and find that Manulife did not absolutely and unconditionally repudiate the contract, as required under Indiana law.

## I. BACKGROUND

Appellants Crosspoint Seven, LLC, Intech Partners One, LLC, and Intech Partners Eleven, LLC all make up part of the Lauth Property Group ("Lauth"). Lauth is comprised of companies formed to acquire, develop, hold, or sell commercial real estate in Indiana. From May to August 2002, each appellant negotiated with Manulife, a commercial mortgage lender, to receive, in aggregate, a $32 million loan subject to the terms and conditions of individually applicable commitment letters. The commitment letters required the appellants to pay two non-refundable application and commitment fees totaling $149,614 and an aggregate refundable "Good-Faith Deposit" in the amount of $320,300. Manulife was to return this good-faith deposit at closing, assuming that each appellant fulfilled the various terms and conditions espoused in the commitment letters.

Both parties were on course to fulfill the terms and conditions of the commitment letters when Manulife learned of the weak financial performance of Escient, one of Intech Partners One's tenants. On September 6, 2002, there was a telephone conversation between Manulife representative Anthony Giannini and Lauth official Greg Gurnik which focused on Manulife's concern over the poor financial performance of Escient. Giannini testified that he told Gurnik that he needed to report Escient's poor financial performance to Manulife's main office in Toronto. Giannini also needed to know if Lauth was willing to make a type of proposal which would mitigate Manulife's concerns about Escient. Gurnik claims that Giannini told him that without further collateral, Manulife's headquarters would not approve the loan.

On September 9, 2002, there was a follow-up conversation between Brian Goldman of Manulife and William Popich, Senior Vice President of Lauth. In essence, Goldman confirmed what Giannini had said a few days earlier. Popich testified that he made it clear to Goldman that if Lauth needed to supply more collateral, the deal was off and that they would need to come up with a new contract. However, Goldman and Popich continued the conversation discussing potential ways to change various loan terms in a way that would satisfy both sides. For instance, one option the parties discussed was increasing collateral in return for a reduced interest rate. The parties left this meeting with the terms of the loan unresolved.

During the following week, Lauth continued to perform the due diligence required under the commitment letters including, on September 9th, overnighting certain required materials including Lauth's organizational documents, certified rent rolls, various bills and permits, and tax identification numbers. That same day, Lauth also sent draft estoppel letters and subordination agreements to their tenants. On September 10th, Lauth faxed pertinent information to an architect preparing inspection reports on the properties involved in the deal. A day later,

Lauth faxed a draft zoning compliance letter to its counsel and inquired about the acceptability of a zoning endorsement given the approaching closing date.

That same day, September 11th, two days after Goldman's discussion with Popich and nine days before the deal was originally set to close, Manulife's Toronto office informed Giannini and Goldman that Lauth's loans had been approved despite Escient's financial situation. On the following day, Giannini left a message for Gurnik informing him that Manulife was ready to close on the deal "as is," without any additional collateral.

Later that day, Lauth faxed a letter expressing uncertainty regarding the status of the deal to Giannini and Goldman.  Lauth demanded a written response from Manulife detailing its intentions.  The letter, in relevant part, stated:
> During the last seven day period we have received from you conflicting statements that cannot be reconciled to each other or the terms of the loan commitments. Your statements have ranged from a statement that loans will be funded, a statement that Toronto will not fund the loans without credit enhancement for the Escient lease to a statement that Toronto is unwilling to fund the loans because of Escient's financials notwithstanding the existence of the commitments.

Manulife's faxed response, sent on September 13th, was unequivocal, stating that "[we] hereby confirm Manulife's intention and readiness to close next week on or before September 20, 2002, provided Borrower has complied with all of the terms and conditions outlined in Our Company's Commitment Letters…."

Following this letter, Manulife extended the expiration date of the Commitment Letters to October 15, 2002.  However, Lauth failed to complete all of the terms and conditions of the Commitment Letters, and on October 16th Manulife informed Lauth in writing that Lauth had forfeited the good faith deposit and Manulife would keep the non-refundable fees and the good faith deposit as liquidated damages.  In response, Lauth filed suit to recover damages claiming Manulife anticipatorily repudiated the Commitment Letters on September 6, 2002 when Giannini informed Gurnik that additional collateral was necessary to move forward on the loans.

## II.  ANALYSIS

We review de novo a district court's grant of summary judgment. *Smith v. Northeastern Ill. Univ.*, 388 F.3d 559, 565 (7th Cir. 2004).  We construe all facts and inferences in the light most favorable to the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Tutman v. WBBM-TV, Inc./CBS, Inc.*, 209 F.3d 1044, 1048 (7th Cir. 2000).  Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together

with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Tutman*, 209 F.3d at 1048 (quoting Fed. R. Civ. P. 56).

Under Indiana law an anticipatory breach of contract occurs only when there is a "positive, absolute, and unconditional" repudiation. *Angelone v. Chang*, 761 N.E.2d 426, 429 (Ind. App. 2001) (citing *Jay County Rural Elec. Membership Corp. v. Wabash Valley Power Ass'n*, 692 N.E.2d 905, 911 (Ind. App. 1998). Given the harsh remedy represented by the doctrine of anticipatory breach, the requirement that the repudiation be "clear and absolute is a strict one." *Angelone*, 761 N.E.2d at 429.

Here, there is no evidence that Manulife positively, absolutely and unconditionally repudiated the commitment letters. Manulife's request, during due diligence, that Lauth consider making a proposal to mitigate for newly acquired negative information regarding Escient's financial weakness cannot be seen as a repudiation of the contract. In fact, the evidence indicates that despite Escient's financial situation, Manulife's main office was willing to close the deal "as is." Giannini and Goldman left voice mail messages for Gurnik and Popich, respectively, informing each that Manulife intended to proceed with the loans as originally negotiated.

It is also clear from the evidence that Lauth did not view the conversations of September 6th and 9th with Manulife representatives as a repudiation of the negotiated commitment letters. Lauth continued to take actions necessary to close the deal by the expiration date of the commitment letters, including sending required documents by overnight delivery. The most compelling evidence that Manulife's actions do not rise to the level of an unconditional repudiation is the letter sent by Lauth requesting clarification of Manulife's intentions. Had Manulife positively, absolutely and unconditionally repudiated the commitment letters on September 6th and 9th, Lauth would not have had to send a letter requesting a "written statement of [Manulife's] intentions." As such, Lauth cannot show that Manulife unconditionally repudiated the commitment letters and therefore was in anticipatory breach of contract.

Even assuming, *arguendo*, that Manulife repudiated the commitment letters on September 6th and 9th, the evidence clearly indicates that Manulife retracted any such repudiation before Lauth suffered any detrimental reliance or considered the repudiation to be final. In response to Lauth's September 12th letter demanding a written response from Manulife detailing its intentions, on September 13th Manulife wrote, "[we] hereby confirm Manulife's intention and readiness to close next week on or before September 20, 2002, provided Borrower has complied with all of the terms and conditions outlined in Our Company's Commitment Letters …" Even if a party repudiates a contract, a timely retraction nullifies the

repudiation.  *See* Restatement (Second) of Contract § 256; *see also Mobil Oil Exploration v. United States*, 530 U.S. 604, 621-22 (2000) (favorably citing § 256).[1] Again, it is clear from Lauth's September 11th letter that it did not consider Manulife's repudiation to be final, otherwise there would be no reason to send a letter demanding a clarification of Manulife's intentions to move forward. Additionally, there is no evidence that Lauth materially changed its position in reliance on the alleged repudiation.  Lauth applied for no alternative financing, paid no other lender any fees, and entered into no additional contracts or agreements between September 6th through the 12th and 13th.

### III. CONCLUSION

For the reasons stated above, we AFFIRM the district court's order granting summary judgment in favor of the defendant, Manufacturers Life Insurance Company.

---

[1]Restatement (Second) of Contracts § 256 states in relevant part:

Nullification of Repudiation or Basis for Repudiation
(1) The effect of a statement as constituting a repudiation ... or the basis for repudiation ... is nullified by a retraction of the statement if notification of the retraction comes to the attention of the injured party before he materially changes his position in reliance on the repudiation or indicates to the other party that he considers the repudiation to be final.