[Cite as *JDS So Cal, Ltd. v. Dept. of Natural Resources*, 2018-Ohio-1159.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| JDS So Cal, Ltd., | : | |
| Plaintiff-Appellee, | : | |
| | : | No. 16AP-665 |
| v. | : | (C.P.C. No. 14CV-13181) |
| Ohio Department of Natural Resources, | : | (REGULAR CALENDAR) |
| Defendant-Appellant. | : | |

---

D E C I S I O N

Rendered on March 29, 2018

---

**On brief:** *Cooper & Elliott, LLC, Rex H. Elliott, Charles H. Cooper, Jr.*, and *Sean R. Alto*, for appellee. **Argued:** *Rex H. Elliott.*

**On brief:** *Michael DeWine*, Attorney General, and *Christopher P. Conomy*, for appellant. **Argued:** *Christopher P. Conomy.*

---

APPEAL from the Franklin County Court of Common Pleas

KLATT, J.

{¶ 1} Defendant-appellant, the Ohio Department of Natural Resources ("ODNR"), appeals a judgment of the Franklin County Court of Common Pleas that granted plaintiff-appellee, JDS So Cal, Ltd. ("JDS"), summary judgment and denied ODNR summary judgment. For the following reasons, we reverse that judgment and remand for the trial court to enter summary judgment in ODNR's favor.

{¶ 2} In 1996, Morno Holding Company ("Morno") deeded to ODNR a 17.85-acre parcel of undeveloped property abutting Sawmill Place Boulevard (hereinafter "the Sawmill property"). Morno added to the deed a restrictive covenant that provided that the

conveyance was "granted and accepted on the condition that the real property be used and occupied solely for public purposes." (Pl.'s Ex. 2, June 1, 2016 Pl.'s Mot. for Summ. Jgmt.) Apparently, Morno included the public-use restriction in the deed to support a charitable tax deduction.

{¶ 3} After receiving the property, ODNR named it the "Sawmill Wetland Education Area" and opened it to school groups so students could study the wetlands contained in the property. The Sawmill property, however, was little utilized for educational purposes. Moreover, security concerns forced ODNR to fence the property and only allow access to the general public by reservation.

{¶ 4} Between 2006 and 2011, ODNR repeatedly offered the Sawmill property to the Columbus Recreation and Parks Department ("Parks Department"). While the Parks Department expressed some interest in acquiring the Sawmill property, the Parks Department ultimately declined to take the property. The Parks Department did not want the responsibility for paying the common-area-maintenance charges imposed on the property by a restrictive covenant in the original subdivision plat documents.

{¶ 5} In 2012, ODNR entered into a contract with JDS to swap the Sawmill property for a 43.33-acre property located on the west bank of the Olentangy River (hereinafter "the Olentangy property"). While JDS did not own the Olentangy property, it had an option to purchase the property. ODNR wanted the Olentangy property due to its larger size, proximity to the Olentangy River and Highbanks Metro Park, and the variety and uniqueness of the wildlife inhabiting the property. JDS wanted the Sawmill property in order to develop it for commercial use.

{¶ 6} The dispute in this case largely centers on Section 4(d)(1) of the land-swap contract. Pursuant to that provision, JDS agreed to obtain a release of the public-use restriction in the Sawmill property's deed prior to the property transfer. ODNR agreed to work cooperatively with JDS to obtain that release. If JDS did not obtain a release, it could either terminate the contract or waive the requirement that it obtain a release. If JDS chose to waive the release requirement, it was bound to indemnify ODNR for any breach of the public-use restriction.

{¶ 7} In total, the contract included three contingencies to be satisfied prior to the property transfer. Specifically, the contract stated:

(d) Unless waived by [JDS], the following contingencies shall be satisfied by 5:00 p.m., Eastern Standard Time, on the date which is Three Hundred and Sixty (360) Days after the Effective Date (the "Deed Contingency Period").

(1) [JDS] obtaining the release of the current "public use" restriction encumbering the [Sawmill] Property. [JDS] and [ODNR] shall both work cooperatively to obtain the executed release of such encumbrance. Unless requested by [JDS], all communications with grantor of the deed in which the "public use" restriction originates shall be exclusively conducted by [JDS]. To the extent that this contingency is not timely satisfied, [JDS] may elect to terminate this Agreement pursuant to Section 6(a)(iii) in the exercise of its sole and absolute discretion or waive the contingency. Absent a timely written notice of termination, [JDS] shall be deemed to have waived this contingency. In the event that [JDS] elects to waive the contingency for the release of the current "public use" restriction or is deemed to have waived pursuant to the immediately prior sentence, [JDS] shall indemnify and hold harmless [ODNR] from any and all claims, losses, liabilities, causes of action, fines, penalties, or expenses, including, but not limited to, reasonable attorney's fee[s] and expenses, arising from or related to the continuation of the "public use" restriction after the conveyance of the [Sawmill] Property to [JDS], its successors and assigns. The foregoing indemnification and hold harmless agreement of [JDS] shall survive the expiration or termination of this Agreement.

(2) [JDS] (and/or its valid designee) has taken record title to the [Olentangy] Property, with any and all costs as to this pre-condition to be paid for by [JDS].

(3) Any title or survey objection of [ODNR] or [JDS] shall have been cured.

(Pl.'s. Ex. 1 at Section 4(d)(1) through (3), June 1, 2016 Pl.'s Mot. for Summ. Jgmt.)

{¶ 8}   In addition to setting forth contingencies, the contract scheduled a closing, at which ODNR would assume possession of the Olentangy property and JDS would assume possession of the Sawmill property.  The closing had to occur "on a date determined by [JDS], not less than ten (10) days after written notice is given to [ODNR] but not later than thirty (30) days after the end of the Deed Contingency Period."  (Pl.'s Ex. 1 at Section 3(a), June 1, 2016 Pl.'s Mot. for Summ. Jgmt.)

{¶ 9}   The deed contingency period began on April 12, 2012, the date on which the contract was fully executed.  Consequently, JDS had until April 7, 2013 to satisfy the contingencies contained in Section 4(d).  At the very latest, the closing had to occur on May 7, 2013, provided JDS gave ODNR notice by April 27, 2013.

{¶ 10}   By June 2012, news of the land-swap deal had reached the public, and environmental groups began expressing their opposition to the deal.  Also in June 2012, JDS learned that its title insurer would issue a title commitment without a release of the public-use restriction from Morno, if ODNR "release[d] the restriction on their end at closing."  (Pl.'s Ex. 10, Ruma Dep.)   To address these developments, JDS drafted an amendment to the parties' contract.

{¶ 11} In the draft amendment, JDS agreed to incorporate into the Sawmill property's deed a restrictive covenant requiring JDS to preserve 3.08 acres of the Sawmill property as a wetland.  JDS added this change to appease the environmental groups who objected to any commercial development of the Sawmill property.  The draft agreement also included a provision requiring ODNR to state in the Sawmill property's deed that it was "releas[ing] and discharg[ing] of record the Use Restriction and any and all rights it may have to enforce the Use Restriction for the [Sawmill] Property."  (Def.'s Ex. 6A at Ex. C to the Purchase Agreement, Section 1, June 15, 2016 Def.'s Memo in Opp. to Pl.'s Mot. for Summ. Jgmt.)  This alteration of the contract would allow JDS to acquire title insurance even if it could not obtain a release of the public-use restriction from Morno.

{¶ 12} While ODNR considered whether it would agree to the amendment, JDS approached Morno and requested that it release the public-use restriction.  Morno agreed to review the matter.

{¶ 13} In August 2012, ODNR's director and the attorney general executed the amendment. The amendment then went to the governor's office, as it was not binding without the governor's signature.

{¶ 14} From summer 2012 through winter 2012/2013, ODNR officials spoke about the land-swap deal with representatives of various environmental groups, including the Ohio Environmental Council, The Nature Conservancy, and the Friends of the Sawmill Wetlands. These groups opposed the land-swap deal and wanted to work with ODNR to arrive at an alternate disposition for the Sawmill property. In short, these groups wanted the Sawmill property preserved in its undeveloped state.

{¶ 15} On December 12, 2012, Karl Gebhardt, then a deputy director of ODNR, spoke with Kate Hastings, a resident of the Sawmill area. Hastings told Gebhardt that she had attended a meeting held by the Friends of the Sawmill Wetlands the previous evening. During that meeting, a representative of the City of Columbus ("City") expressed interest in acquiring the Sawmill property. Hastings asked Gebhardt if ODNR would speak with the City about its interest. Gebhardt responded that, if the City "wanted to offer a proposal [to take possession of the Sawmill property,] [ODNR] would talk with them[,] but it need[ed] to be an official offer very soon which [ODNR] would evaluate." (Pl.'s Ex. 7, June 1, 2016 Pl.'s Mot. for Summ. Jgmt.) Later, when questioned as to why he expressed openness to an "official offer" from City, Gebhardt explained that he "didn't think there was any reason why the City couldn't have [made an offer]. If they wanted to, that was up to them. Whether we accepted it or what we did with it, I mean, that's a whole different situation. But if the City was really interested like we heard, then put something on the table." (Gebhardt Dep. at 99.)

{¶ 16} Two days after Gebhardt's conversation with Hastings, Allen McKnight, the director of the City's Parks Department sought a meeting with Gebhardt. Gebhardt and Fred Shimp, an assistant director of ODNR, met with McKnight soon thereafter to determine if the City actually wanted the Sawmill property. Gebhardt figured, "If they were or were not [interested], we would be able to convey that * * * if we were * * * asked by the environmental [groups,] [']Why aren't you working with the City[?'] We could convey to them we did, we were talking with the City, they're not interested." *Id.* at 104. According to Gebhardt, McKnight "said that there could be interest on the part of the City but there

were some issues that obviously had to be addressed." *Id.* at 101. Gebhardt and Shimp told McKnight "where [ODNR] w[as] with [the deal with JDS], [and] [McKnight] understood it. He did not want to get really in the middle * * * of this deal that's already been going forward but he said if * * * something happened where it didn't go forward, they may have an interest. But it wasn't a real firm commitment on their part." *Id.*

{¶ 17} Despite McKnight's equivocacy in the meeting, the City joined with The Nature Conservancy to make a formal offer regarding the Sawmill property. In a letter dated January 4, 2013, McKnight proposed that the Parks Department would assume permanent ownership of the Sawmill property and manage it for the public's benefit. The Nature Conservancy would provide recommendations for protecting the wetlands and donate up to $50,000 as a match for contributions from individuals, foundations, and corporations wishing to help preserve the site.

{¶ 18} On January 8, 2013, Josh Knights, the executive director of The Nature Conservancy, met with James Zehringer, ODNR's director, Shimp, and Gebhardt. After the meeting, Knights sent Zehringer an email thanking him for the "frank discussion" regarding the Sawmill property. (Pl.'s Ex. 16, Gebhardt Dep.) Knights also stated:

> As mentioned, our intention in submitting a proposal about the property was to provide you with an additional option as our impression was that you were "looking at options" prior to the holidays. My sense from our meeting is that your options are limited at this point and that preserving the property as it exists is not one. We understand your decision to divest the property given its location and resource constraints.

*Id.* Shimp later confirmed Knights' impression of ODNR's position when he stated in his deposition that, in January 2013, ODNR was not entertaining any options for the Sawmill property other than transferring the property to JDS pursuant to the parties' contract.

{¶ 19} Although the environmental groups' lobbying of ODNR did not succeed, ODNR was not the only entity that the environmental groups targeted. In conjunction with lobbying ODNR, the environmental groups also appealed to Morno. Both the Ohio Environmental Council and the Sierra Club requested that Morno enforce the public-use restriction in the deed to prevent the commercial development of the Sawmill property. In response to both the environmental groups and JDS, Morno pronounced that it had no

interest in the Sawmill property and, thus, had nothing to enforce or release. Morno wanted nothing to do with the land-swap deal or the controversy over the potential development of the Sawmill property.

{¶ 20} After Morno announced that it would not release the public-use restriction, the contract amendment pending before the governor assumed greater importance. JDS wanted to develop the Sawmill property for commercial use, so it needed to eliminate, or at least neutralize, the public-use restriction. With Morno refusing to provide a release, JDS urged ODNR to agree, as stated in the amendment, to release and remove the public-use restriction from the deed. However, ODNR became concerned that it, alone, lacked the legal authority necessary to release the public-use restriction.

{¶ 21} In late 2012 or early 2013, Shimp and Paul Baldridge, the chief of ODNR's office of real estate and land management, met with James Schrim, the managing member of JDS, and James Samuel, a lobbyist JDS had hired. According to Shimp, he told Schrim and Samuel that ODNR was conducting a legal analysis into whether it could unilaterally release the public-use restriction and that analysis "would have a very, very strong impact whether or not [ODNR] would be able * * * to fully sign the amendment." (Shimp Dep. at 58.) Baldridge recalls Shimp expressing "concerns about the viability of [the land-swap deal] moving forward" given the legal question that had arisen regarding whether ODNR, alone, could release the public-use restriction. (Baldridge Dep. at 34.)

{¶ 22} Schrim remembers this meeting very differently. According to Schrim, Shimp said "that the State did not want the [Olentangy] property, and did not want to go forward with the [land-swap] transaction." (Schrim Dep. at 8.) Schrim also recalls Shimp stating, "We're the government, we can do anything we want. We don't want the [Olentangy] property. But if you find somebody to take it, we might go forward with the transaction." *Id.* at 114. Finally, according to Schrim, "ODNR * * * said[,] ['W]e don't want to close on the transaction and we're killing the deal.[']" *Id.* at 99.

{¶ 23} Samuel's recollection of the meeting does not fully correspond with Schrim's recollection. In Samuel's memory, "the feeling of the discussion [was] that the deal might not be brought to a successful conclusion." (Samuel Dep. at 48.) However, he does not recall any ODNR representative stating that ODNR would not perform its obligations under the contract or that ODNR did not want the Olentangy property. He also does not recollect

Shimp stating, "We're the government, we can do anything we want," but he does remember Shimp making a similar statement in a heated moment of the meeting.

{¶ 24} After this meeting, Shimp contacted Samuel and told him that, based on the legal advice ODNR had received regarding the public-use restriction, ODNR was recommending that the governor not sign the amendment.[1] Although Samuel cannot specifically remember this conversation, he generally recalls a conversation in which Shimp communicated to him that "the deal would probably not go through." *Id.* at 50. Samuel cannot recollect whether Shimp was referring to the land-swap deal or the execution of the amendment.

{¶ 25} Based on his meeting with Shimp and Baldridge, Schrim believed that ODNR had reneged on the parties' contract. JDS, however, continued to pursue the land-swap deal. In a letter dated March 6, 2013, JDS asked ODNR to grant an extension of the deed contingency period, which was set to expire on April 7, 2013.

{¶ 26} ODNR responded to JDS' letter with a March 14, 2013 letter. In that letter, ODNR refused to grant the requested extension. ODNR also stated that it was "not willing to amend the Agreement to, in any manner, assume any obligations with respect to the removal and/or release of the 'public-use' restriction." (Def.'s Ex. 24 at 1, June 22, 2016 Def.'s Mot. for Summ. Jgmt.) However, ODNR "st[ood] ready to consummate the transaction according to the terms of the Agreement." *Id.* at 2.

{¶ 27} Additionally, in the March 14, 2013 response letter, ODNR referred to the two options before JDS if it wanted the Sawmill property: (1) obtain a release of the public-use restriction from Morno or (2) agree to acquire the property "as is." Butler and Samuel discussed these two options in a text message conversation on March 17, 2013. Butler texted to Samuel, "The only thing [ODNR] need[s] is a response to the [March 14, 2013] letter. There are two choices or paths ahead. What's the path that [JDS] think[s] is viable[?]" (Pl.'s Ex. 45, June 1, 2016 Pl.'s Mot. for Summ Jgmt.) Samuel replied that "[t]here is an 'as is' path (like in the letter) but it takes a discussion." *Id.* Butler then stated,

---

[1] By the time ODNR reached this conclusion, the question of whether the governor would sign the amendment may have become moot. Craig Butler, then an assistant policy director to the governor, had spoken with the governor regarding the land-swap deal, and the governor had decided that he did not favor going forward with the deal. Butler, therefore, did not present the amendment to the governor for his signature.

"If [the Sawmill property] is taken [']as is[,'] we will expect it not to be developed and be forced to protect the deed." *Id.* Samuel responded, "Ok – then that is the deal killer." *Id.*

{¶ 28} Five days later, in a letter dated March 22, 2013, JDS formally replied to ODNR's March 14, 2013 letter. In summarizing JDS' position regarding the public-use restriction, the letter stated:

> [ODNR] and the Governor's staff ha[ve] asked [JDS] to get a release from Morno Holding Co. * * * of *"Morno's interest in the Deed."* [JDS] has repeatedly told them that such a release is not attainable because Morno has nothing to release and that what they are asking for is not needed to close the transaction. Morno has consistently demonstrated that it has no remaining interest in the [Sawmill] Property, repeatedly communicated that it has no interest in this transaction, and that it wants to be left entirely out of this matter. * * * **[JDS] sought a release from Morno, none could be given and they moved on with trying to close the transaction.**
>
> Specifically with respect to the "public-use" restriction, [JDS] advised [ODNR] that it had received a title commitment from Stewart Title on August 16th, 2012, indicating that Stewart Title would not require a "release" of the "public-use" restriction from Morno to obtain title insurance and therefore marketable title. * * * At that time, Stewart Title informed [JDS] that it would only require [ODNR] to release its interest (if it has any) in the public-use restriction. Stewart is only requesting comfort that [ODNR], itself, would not attempt to enforce the public-use restriction post-swap. * * *
>
> That concept of a "Release" by [ODNR] was incorporated into the "Release, Declarations of Easements, Covenants and Restrictions" document provided to ODNR on July 19th, 2012, as part of the First Proposed Amendment at the request of [ODNR]. * * * [T]here may be numerous other ways to satisfy the substance of Stewart Title's request. It really is as simple as satisfying Stewart Title that [ODNR], itself, has no continuing or springing right in the Property post-closing.
>
> * * *

> [JDS] hereby waives its rights under Section 4(d)(1) of the Agreement and hereby agrees to indemnify [ODNR] in accordance with the terms of that provision. In your parlance, [JDS] is willing to accept the property "as is" with respect to the public-use restriction, so long as the Governor's Deed is constructed to allow for Stewart Title to insure marketable title for [JDS'] intended use of the property.

(Emphasis sic.) (Def.'s Ex. 27 at 3-4, June 22, 2016 Def.'s Mot. for Summ Jgmt.)

{¶ 29} In a response letter dated April 3, 2013, ODNR refused to "waive the effectiveness, if any, of the 'public use' restriction (without a complete release of the same from the party who placed the restriction of record and/or the final determination that the restriction is not effective from a court of appropriate jurisdiction) or waive or condition [ODNR's] right to enforce the 'public use' restriction." (Def.'s Ex. 28 at 1, June 22, 2016 Def.'s Mot. for Summ. Jgmt.) ODNR also declined to acknowledge JDS' waiver of its obligation under Section 4(d)(1) because that waiver was "based on [ODNR's] agreement to execute a Governor's deed that contain[ed] a release of [ODNR's] right to enforce or recognize the 'public use' restriction, which (as noted above) [ODNR] w[ould] not do." *Id.* at 1-2. However, ODNR repeated that it "st[ood] ready to consummate this transaction in accordance with the terms of the Agreement on the closing date determined under Section 3(a) of the Agreement." *Id.* at 1.

{¶ 30} JDS did not give ODNR written notice of the closing by April 27, 2013, as required by Section 3(a) of the contract. On May 1, 2013, ODNR sent JDS a letter stating that, due to the lack of timely notice, ODNR "consider[ed] [JDS] in breach of its obligations under the Agreement and the Agreement incapable of being consummated." (Def.'s Ex. 32, June 22, 2016 Def.'s Mot. for Summ. Jgmt.) The property swap contemplated in the contract never occurred.

{¶ 31} On December 16, 2014, JDS filed suit in the trial court against ODNR, alleging a claim for breach of contract.[2] JDS sought specific performance for the conveyance of the Sawmill property from ODNR to JDS free of all liens and encumbrances.

---

[2] JDS also named The Nature Conservancy as a defendant in its suit. However, on January 28, 2016, after a settlement between JDS and The Nature Conservancy, the trial court entered an order dismissing JDS' claim against The Nature Conservancy.

{¶ 32} After conducting discovery, both JDS and ODNR moved for summary judgment. JDS argued that ODNR had breached Section 4(d)(1) of the contract because it failed to work cooperatively with JDS to obtain a release of the public-use restriction. ODNR disputed this argument and maintained that Section 4(d)(1) did not require it to unilaterally release the public-use restriction.

{¶ 33} In a judgment entered September 2, 2016, the trial court granted JDS summary judgment and denied ODNR summary judgment. The trial court ordered ODNR to transfer, convey, and deliver to JDS the deed to the Sawmill property.

{¶ 34} ODNR appeals the trial court's September 2, 2016 judgment, and it assigns the following errors:

> 1. The trial court erred in granting Plaintiff-Appellee's Motion for Summary Judgment on the issue of breach of contract.
>
> 2. The trial court erred in denying Defendant-Appellant's Motion for Summary Judgment on the issue of breach of contract.
>
> 3. The trial court erred in finding that the contract language and equity require Defendant-Appellant to transfer valuable land to Plaintiff-Appellee for nothing in return (denying Defendant-Appellant's Motion to Dismiss, filed on January 20, 2015, Defendant-Appellant's Motion for Partial Summary Judgment, filed September 22, 2015, and Defendant-Appellant's Motion for Summary Judgment, filed June 22, 2016; and granting Plaintiff-Appellee's Motion for summary judgment, filed June 1, 2016).

{¶ 35} We will begin our analysis with the first two assignments of error, which we will address together. These two assignments of error challenge the trial court's decision to grant JDS summary judgment on its breach-of-contract claim and deny ODNR summary judgment on the same claim. A trial court must grant summary judgment under Civ.R. 56 when the moving party demonstrates that: (1) there is no genuine issue of material fact; (2) the moving party is entitled to judgment as a matter of law; and (3) reasonable minds can come to but one conclusion when viewing the evidence most strongly in favor of the nonmoving party, and that conclusion is adverse to the nonmoving party. *Hudson v. Petrosurance, Inc.*, 127 Ohio St.3d 54, 2010-Ohio-4505, ¶ 29; *Sinnott v. Aqua-Chem, Inc.*, 116 Ohio St.3d 158, 2007-Ohio-5584, ¶ 29. Appellate review of a trial court's ruling on a

motion for summary judgment is de novo. *Hudson* at ¶ 29. This means that an appellate court conducts an independent review, without deference to the trial court's determination. *Zurz v. 770 W. Broad AGA, L.L.C.*, 192 Ohio App.3d 521, 2011-Ohio-832, ¶ 5 (10th Dist.); *White v. Westfall*, 183 Ohio App.3d 807, 2009-Ohio-4490, ¶ 6 (10th Dist.).

{¶ 36} The party moving for summary judgment bears the initial burden of informing the trial court of the basis for the motion and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact. *Dresher v. Burt*, 75 Ohio St.3d 280, 293 (1996). The moving party does not discharge this initial burden under Civ.R. 56 by simply making conclusory allegations. *Id.* Rather, the moving party must affirmatively demonstrate by affidavit or other evidence allowed by Civ.R. 56(C) that there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. *Id.* If the moving party meets its burden, then the nonmoving party has a reciprocal burden to set forth specific facts showing that there is a genuine issue for trial. Civ.R. 56(E); *Dresher* at 293. If the nonmoving party does not so respond, summary judgment, if appropriate, shall be entered against the nonmoving party. *Dresher* at 293.

{¶ 37} To establish a cause of action for breach of contract, a plaintiff must prove: (1) the existence of a contract, (2) performance by the plaintiff, (3) breach by the defendant, and (4) damages or loss resulting from the breach. *Lucarell v. Nationwide Mut. Ins. Co.*, ___ Ohio St.3d ___, 2018-Ohio-15, ¶ 41; *Jarupan v. Hanna*, 173 Ohio App.3d 284, 2007-Ohio-5081, ¶ 18 (10th Dist.). A defendant breaches a contract when it fails, without legal excuse, to perform a promise that forms the whole or part of the contract. *National City Bank v. Erskine & Sons, Inc.*, 158 Ohio St. 450 (1953), paragraph one of the syllabus; *accord Jarupan* at ¶ 18, quoting *Little Eagle Properties v. Ryan*, 10th Dist. No. 03AP-923, 2004-Ohio-3830, ¶ 15 ("In order to prove a breach by the defendant, a plaintiff must show that the defendant 'did not perform one or more of the terms of a contract.' ").

{¶ 38} This case implicates three theories on which ODNR arguably breached the contract between the parties: (1) ODNR breached a specific term of the contract, i.e., Section 4(d)(1) and/or Section 4(g); (2) ODNR committed an anticipatory breach, or repudiation, of the contract; and (3) ODNR breached the implied duty of good faith and fair dealing. We will address each theory in turn.

{¶ 39} Section 4(g) of the contract required ODNR to "cooperate in every reasonable manner with [JDS] in the obtaining of any governmental approvals, wetland mitigation permits, and grants/project assistance and permits for [JDS'] desired development and use of the [Sawmill] Property." (Pl.'s Ex. 1 at Section 4(g), June 1, 2016 Pl.'s Mot. for Summ. Jgmt.) In its summary judgment briefing, JDS did not mention Section 4(g), much less argue that ODNR breached Section 4(g). Nevertheless, the trial court grouped Section 4(g) with Section 4(d)(1) and concluded that ODNR breached both "cooperation clauses" by refusing "to assist JDS in resolving" the public-use restriction. (Sept. 2, 2016 Decision & Entry at 3, fn. 3, and 9.)

{¶ 40} To the extent that the trial court found a breach of Section 4(g), it erred. A party moving for summary judgment must specifically delineate the basis upon which it seeks summary judgment to allow the opposing party a meaningful opportunity to respond. *Mitseff v. Wheeler*, 38 Ohio St.3d 112 (1988), syllabus. Granting summary judgment on a basis not raised deprives the party opposing summary judgment of any opportunity to respond. Consequently, a trial court commits reversible error if it awards summary judgment on a ground not specified in the motion for summary judgment. *State ex rel. Sawicki v. Court of Common Pleas*, 121 Ohio St.3d 507, 2009-Ohio-1523, ¶ 27; *Mannion v. Lake Hosp. Sys., Inc.*, 11th Dist. No. 2016-L-015, 2016-Ohio-8428, ¶ 22; *Daily Servs., LLC v. Ohio Bur. of Workers' Comp.*, 10th Dist. No. 13AP-509, 2013-Ohio-5716, ¶ 15; *Ware v. King*, 187 Ohio App.3d 291, 2010-Ohio-1637, ¶ 17 (3d Dist.). Here, JDS did not seek summary judgment on the ground that ODNR breached Section 4(g) of the contract, and, consequently, the trial court erred in granting JDS summary judgment on that ground.

{¶ 41} Moreover, JDS' failure to argue in the trial court that ODNR breached Section 4(g) has an additional consequence. Generally, a party waives the right to appeal an issue that the party could have, but did not, raise before the trial court. *Columbus City School Bd. of Edn. v. Franklin Cty. Bd. of Revision*, 144 Ohio St.3d 549, 2015-Ohio-4837, ¶ 14; *Niskanen v. Giant Eagle, Inc.*, 122 Ohio St.3d 486, 2009-Ohio-3626, ¶ 34. Because JDS did not contend in its summary judgment briefing that ODNR breached Section 4(g), it

waived its ability to raise that contention on appeal. We, therefore, will not review whether ODNR breached Section 4(g).[3]

{¶ 42} As we stated above, Section 4(d)(1) of the contract required JDS to "obtain[ ] the release of the current 'public use' restriction encumbering the [Sawmill] Property." (Pl's. Ex. 1 at Section 4(d)(1), June 1, 2016 Pl.'s Mot. for Summ. Jgmt.) It further required JDS and ODNR to "work cooperatively to obtain the executed release of such encumbrance." *Id.* ODNR has consistently argued that Section 4(d)(1) only obligated it to cooperate with JDS' efforts to obtain an executed release of the public-use restriction from Morno. In other words, ODNR contends that it agreed to assist JDS in getting Morno to release the public-use restriction; it did not agree to unilaterally release the public-use restriction itself.

{¶ 43} JDS never argued below an alternate interpretation of Section 4(d)(1). Now, on appeal, it has conceded that ODNR's interpretation of Section 4(d)(1) is correct. We agree with the parties' joint interpretation because it is consistent with the law governing releases of restrictive covenants.

{¶ 44} A "restrictive covenant" is a " 'private agreement, usu[ally] in a deed or lease, that restricts the use or occupancy of real property, esp[ecially] by specifying lot sizes, building lines, architectural styles, and the uses to which the property may be put.' " *Canton v. State*, 95 Ohio St.3d 149, 2002-Ohio-2005, ¶ 28, quoting *Black's Law Dictionary* 371 (7th Ed.Rev.1999). Restrictive covenants create rights and duties between the original promising parties. 9 Wolf, *Powell on Real Property*, Section 60.01[2] (2001 Ed.). One party, the covenantor, agrees to do or refrain from doing something enforceable by the other party, the covenantee. *Lynch v. Pelham*, 167 N.H. 14, 20-21 (2014); *Waikiki Malia Hotel, Inc. v. Kinkai Properties Ltd. Partnership*, 75 Haw. 370, 382 (1993). Thus, a restrictive covenant imposes a burden on the covenantor and imparts a benefit to the covenantee. *Waikiki Malia Hotel* at 382; *accord Powell on Real Property*, Section 60.01[2] ("The covenantee's rights are called the 'benefit' of the covenant, while the covenantor's duties are called the 'burden.' ").

---

[3] On appeal, JDS delayed raising an argument based on Section 4(g) until oral argument. Thus, even if we were inclined to consider this argument, the paucity of the argument would hinder our review.

{¶ 45} " 'A person entitled to enforce the benefit of a covenant may extinguish this right by means of a written and recorded release.' " *Ashley v. Kehew*, 992 A.2d 983, 987 (R.I.2010), quoting *Powell on Real Property*, Section 60.10[1]. Termination by release is based on fundamental principles of contract law, as a person entitled to enforce a promise may relieve the promisor of his or her obligation. *Heltman v. Catanach*, 148 N.M. 67, 69 (App.2009), quoting Korngold, *Private Land Use Arrangements: Easements, Real Covenants, and Equitable Servitudes*, Section 11.03, at 386-87 (1990). Notably, a release is a unilateral action taken by the person entitled to enforce the restrictive covenant. Korngold, Section 11.03, at 386; *accord* 7 Thomas, *Thompson on Real Property*, Section 61.07(b)(2)(i), at 627 (2d Ed.2006) ("Those benefiting from a covenant may * * * act unilaterally (release) in terminating fully or partially the covenant.").

{¶ 46} Here, ODNR, the covenantor, promised to use and occupy the Sawmill property solely for public purposes. As the other party to this promise, Morno, the covenantee, had the right to enforce the public-use restriction. Thus, Morno—not ODNR—had the legal authority necessary to release the public-use restriction. Construing Section 4(d)(1) to correlate with the law, therefore, results in the conclusion that Section 4(d)(1) solely obligated ODNR to cooperate with JDS to obtain a release from Morno.

{¶ 47} Applying this interpretation of Section 4(d)(1) to the facts of this case, we must conclude that the trial court erred in finding that ODNR breached the contract. Because Section 4(d)(1) required nothing of ODNR beyond cooperation in obtaining a release from Morno, ODNR did not violate that section when it rejected JDS' request that it unilaterally release the public-use restriction, or when it refused to waive or release any rights it might have to enforce the public-use restriction. Likewise, ODNR did not breach Section 4(d)(1) when it informed JDS that it would protect the deed if JDS acquired the property "as is," i.e., without a release of the public-use restriction from Morno, or when it declined to waive the effectiveness of the public-use restriction absent a release from Morno.

{¶ 48} The trial court also found that ODNR breached Section 4(d)(1) when Gebhardt told Hastings in December 2012 that, if the City "wanted to offer a proposal [to take possession of the Sawmill property,] [ODNR] would talk with them[,] but it need[ed] to be an official offer very soon which [ODNR] would evaluate." (Pl.'s Ex. 7, June 1, 2016

Pl.'s Mot. for Summ. Jgmt.)  The trial court concluded that "encourag[ing] third parties to purchase the [Sawmill] Property out from under JDS"[4] violated ODNR's "specific obligations to cooperate with JDS under the contract."  (Sept. 2, 2016 Decision & Entry at 8-9.)  This conclusion, however, too broadly construes Section 4(d)(1).  That contractual term obligated ODNR to cooperate with obtaining a release from Morno.  Indicating willingness to entertain an "official offer" from the City did not contravene that obligation.

{¶ 49}  Next, we review whether ODNR committed an anticipatory breach, otherwise known as a repudiation, of the contract.  Before the trial court, JDS repeatedly disclaimed that it sought to hold ODNR liable for an anticipatory breach of the contract.  (June 22, 2016 Pl.'s Reply in Support of its Mot. for Summ. Jgmt. at 1-2 ("ODNR breached the contract, plain and simple, and JDS is not advancing an anticipatory repudiation argument."); *id.* at 6 ("JDS' claim is a straightforward breach of contract claim, not anticipatory breach."); July 6, 2016 Pl.'s Memo in Opp. to Def.'s Mot. for Summ. Jgmt. at 8 ("No matter how many times ODNR says that JDS is arguing anticipatory repudiation, it does not make it so."); *id.* at 9 ("JDS' claim is a straightforward breach of contract claim, not anticipatory breach.")).  From these statements, we determine that JDS knew that it could have claimed that ODNR committed an anticipatory breach, and it intentionally chose not to advance that claim.  JDS, therefore, waived a claim for anticipatory breach of the contract.  *See Glidden Co. v. Lumbermens Mut. Cas. Co.*, 112 Ohio St.3d 470, 2006-Ohio-6553, ¶ 49 ("Waiver is a voluntary relinquishment of a known right and is generally applicable to all personal rights and privileges, whether contractual, statutory, or constitutional.").

{¶ 50}  Even if JDS had not waived a claim for anticipatory breach, that claim would fail on its merits.  An anticipatory breach of contract occurs when one party to a contract gives notice to the other party that it will not perform a contractual duty due in the future. *Haman Ents., Inc. v. Sharper Impressions Painting Co.*, 10th Dist. No. 15AP-50, 2015-Ohio-4967, ¶ 23; *Daniel Terreri & Sons v. Bd. of Mahoning Cty. Commrs.*, 152 Ohio App.3d

---

[4] The trial court actually stated that "ODNR encouraged third parties to purchase the *Replacement* [i.e., Olentangy] Property out from under JDS."  (Emphasis added.)  (Sept. 2, 2016 Decision & Entry at 8.)  We reject ODNR's contention that this statement demonstrates that the trial court misunderstood the evidence. Rather, reading the statement in context, we conclude that the trial court merely made a typographical error in referring to the Olentangy property, rather than the Sawmill property.

95, 2003-Ohio-1227, ¶ 48 (7th Dist.). To prevail on a claim for anticipatory breach, a plaintiff must establish that the parties had entered into a contract containing some duty of performance not yet due and, by word or deed, the defendant refused future performance, causing damage to the plaintiff. *Qutifan v. Shafiq*, 10th Dist. No. 15AP-814, 2016-Ohio-4555, ¶ 25; *Haman Ents.* at ¶ 23. Anticipatory breach requires "an overt communication of an intention or an action which renders performance impossible or demonstrates a clear determination not to continue with performance." *Wilson v. Bd. of Trustees*, 10th Dist. No. 91AP-144 (Dec. 24, 1991); *accord Cambridge Co. v. Telsat, Inc.*, 9th Dist. No. 23935, 2008-Ohio-1056, ¶ 8 ("Anticipatory repudiation of a contract has been found where there is an overt action indicating that performance will not be tendered. * * * Indirect inferences are not sufficient."). The communication or action must indicate a clear and unequivocal refusal to perform. *Wilson*; *accord Haman Ents.* at ¶ 23 (holding that a repudiation of a contract must be expressed in clear and unequivocal terms). Mere expressions of doubt as to willingness or ability to perform do not repudiate a contract. *Qutifan* at ¶ 25; *Haman Ents.* at ¶ 23.

{¶ 51} In the case at bar, JDS argues that ODNR committed an anticipatory breach of the contract when it refused to perform its penultimate duty—to transfer the Sawmill property to JDS—prior to the date set in the contract for the property transfer. JDS asserts five instances wherein it alleges that ODNR repudiated its obligation to transfer the Sawmill property: (1) the governor's decision not to go forward with the land swap, (2) ODNR's indication that it was open to an "official offer" from the City to acquire the Sawmill property, (3) ODNR's internal investigation into whether all parties had performed under the contract, (4) ODNR's refusal to waive the effectiveness of the public-use restriction and Butler's statement that ODNR would protect the deed if JDS acquired the Sawmill property "as is," and (5) Shimp's statements to Schrim and Samuel that ODNR did not want to proceed with the land swap.

{¶ 52} JDS' first basis for asserting an anticipatory breach fails because JDS did not present any evidence that a state official or employee communicated the governor's decision to JDS prior to the time for the transfer of the properties arrived. Without communication of the governor's decision prior to the transfer date, JDS had no notice of

the governor's alleged intention to commit a total breach of the contract. Thus, an anticipatory breach could not occur.[5]

{¶ 53} JDS' second and third bases for asserting an anticipatory breach fail because JDS did not show that ODNR's actions overtly demonstrated an intent to not perform the property transfer. The record contains no evidence that JDS knew of either action prior to the time for the property transfer. Moreover, neither action amounts to a clear and unequivocal refusal to perform at the contractually appointed time.

{¶ 54} JDS' fourth basis for asserting an anticipatory breach fails because ODNR's position regarding the public-use restriction did not clearly and unequivocally evince an intent to refuse to transfer the Sawmill property to JDS. Neither ODNR's refusal to waive the effectiveness of the restriction nor its pledge to protect the deed would have precluded conveyance of the property. ODNR only denied JDS the ability to acquire the property free of the complications caused by the public-use restriction.

{¶ 55} JDS' fifth basis for asserting an anticipatory breach requires a more in-depth analysis. As we stated above, the parties discussed whether ODNR would transfer the Sawmill property as required by the contract during the meeting between Shimp, Baldridge, Schrim, and Samuel. According to Schrim, at that meeting, Shimp said, (1) "[T]he State did not want the replacement property, and did not want to go forward with the [land-swap] transaction" (Schrim Dep. at 8), and (2) "We're the government, we can do anything we want. We don't want the replacement property. But if you find somebody to take it, we might go forward with the transaction" (Schrim Dep. at 114). Finally, according to Schrim, "ODNR * * * said[,] ['W]e don't want to close on the transaction and we're killing the deal.[']" *Id.* at 99.

{¶ 56} Read together, these statements do not express doubt regarding ODNR's willingness or ability to consummate the land swap; they instead communicate a blatant refusal to perform. However, the record also contains the testimony of the other attendees at the meeting, who do not recall Shimp communicating so definitively. Baldridge and Samuel remember Shimp only expressing concern about the viability of the land swap. Given this conflicting testimony, we conclude that a question of fact exists as to whether

---

[5] Additionally, during oral argument, JDS conceded that the governor's decision did not constitute an anticipatory breach.

Shimp clearly and unequivocally repudiated ODNR's contractual obligation, then not yet due, to complete the land swap.

{¶ 57} A pending question of fact normally would preclude summary judgment for both parties. ODNR, however, resists that outcome. ODNR requests that we assume that an anticipatory breach occurred. It then argues that, even assuming the existence of an anticipatory breach, it is entitled to summary judgment because it nullified the anticipatory breach by retracting its repudiation of the contract. We agree.

{¶ 58} If a party commits an anticipatory breach, the injured party has the option of (1) immediately terminating the contract and suing on the breach, or (2) continuing the contract and suing the breaching party after the time for performance has passed. *Haman Ents., Inc.*, 2015-Ohio-4967, at ¶ 29. If the non-repudiating party decides to continue with the contract, then the repudiating party has " 'an opportunity to repent and to resume the contract' " by retracting its repudiation. *Vision Entertainment Worldwide, LLC v. Mary Jane Prods., Inc.*, S.D.N.Y. No. 13 Civ. 4215 (AT), 2014 U.S.Dist. LEXIS 154099, 2014 WL 5369776 (Oct. 17, 2014), quoting *Deforest Radio Tel. & Tel. Co. v. Triangle Radio Supply Co.*, 243 N.Y. 283, 293 (1926). A repudiating party may retract its repudiation as long as the non-repudiating party has not materially changed its position in reliance on the repudiation or indicated that it considers the repudiation final. *Crosspoint Seven, LLC v. Mfrs. Life Ins. Co.*, 148 Fed.Appx. 535, 538 (7th Cir.2005) fn. 1; *Edwards v. Wyatt*, 335 F.3d 261, 274 (3d Cir.2003); *Canderm Pharmacal, Ltd. v. Elder Pharmaceuticals, Inc.*, 862 F.2d 597, 604 (6th Cir.1988); Restatement of the Law 2d, Contracts, Section 256(1) (1981); *accord* 13 Lord, *Williston on Contracts*, Section 39:42, at 760-61 (4th Ed.2014) ("[T]he repudiating party has the right and the power to retract as long as the other party has not substantially or materially changed its position in reliance on the repudiation, and thus, the nonrepudiating party who continues to urge performance by the repudiator is merely extending the time within which the retraction may occur.").

{¶ 59} "The principal way for a repudiating party to nullify its repudiation is by making a statement retracting it." *Homeland Training Ctr., LLC v. Summit Point Auto. Research Ctr.*, 594 F.3d 285, 295 (4th Cir.2010). To be effective, the retraction must be clear and unequivocal in evincing the repudiating party's intention to honor its obligations under the contract. *Arlington LF, LLC v. Arlington Hospitality, Inc.*, 637 F.3d 706, 715

(7th Cir.2011); *Anderson Excavating & Wrecking Co. v. Sanitary Improvement Dist. No. 177*, 265 Neb. 61, 69 (2002); *Vahabzadeh v. Mooney*, 241 Va. 47, 51 (1991). After a retraction, the contract is reinstated, which nullifies any claim for total breach that arose with the repudiation. *Williston on Contracts*, Section 39:42, at 762, and Section 43:19, at 22; Restatement, Section 256(1), Comment a; *accord Vision Entertainment Worldwide* ("If the repudiating party retracts its repudiation, the non-repudiating party once again becomes obligated to perform its obligations under the contract."); *Gilmore v. Duderstadt*, 125 N.M. 330, 335-36 (App.1998) ("A retraction, if effective, restores the contract to its original condition and places the parties in the same legal position as before the repudiation.").

{¶ 60} In the case at bar, JDS admits that, after the meeting between Shimp, Baldridge, Schrim, and Samuel, it "continued to take whatever steps it could to try and get the deal done." (Appellee's Brief at 18.) JDS' decision to proceed with the contract gave ODNR the opportunity to retract its repudiation.

{¶ 61} ODNR points to two statements as evidence of its retraction. First, in the March 14, 2013 letter, ODNR stated that it "st[ood] ready to consummate the transaction according to the terms of the Agreement." (Def.'s Ex. 24 at 2, June 22, 2016 Def.'s Mot. for Summ. Jgmt.) Second, in the April 3, 2013 letter, ODNR reiterated that it "st[ood] ready to consummate this transaction in accordance with the terms of the Agreement on the closing date determined under Section 3(a) of the Agreement." (Def.'s Ex. 28 at 1, June 22, 2016 Def.'s Mot. for Summ. Jgmt.) We agree with ODNR that these two statements clearly and unequivocally indicate that ODNR intended to comply with its contractual obligation to swap the Sawmill property for the Olentangy property. ODNR, therefore, retracted its repudiation.

{¶ 62} The trial court determined that ODNR's retraction did not matter because, concomitantly with the retraction, ODNR breached the contract by refusing to assist JDS in resolving the public-use restriction. However, as we concluded above, ODNR did not breach the contract by rebuffing JDS' insistence that ODNR unilaterally release the public-use restriction or waive whatever rights it had under the restriction. Consequently, ODNR effectively retracted its repudiation, which nullified JDS' claim for total breach of the contract.

{¶ 63} Next, we must consider JDS' argument that ODNR breached the implied duty of good faith and fair dealing. Although JDS asserts this argument in its appellate brief, it did not present it to the trial court. JDS, therefore, waived its right to raise the argument on appeal. *See Columbus City School Bd. of Edn.*, 144 Ohio St.3d 549, 2015-Ohio-4837, at ¶ 14; *Niskanen*, 122 Ohio St.3d 486, 2009-Ohio-3626, at ¶ 34.

{¶ 64} Moreover, JDS has failed to allege any facts that could establish a breach of the implied duty of good faith and fair dealing. That duty is not violated "unless there is a breach of a specific obligation imposed by the contract, such as one that permits a party to exercise discretion in performing a contractual duty or in rejecting the other party's performance." *Lucarell*, ___ Ohio St.3d ___, 2018-Ohio-15, at ¶ 43. No such breach occurred here. Consequently, JDS cannot prevail on a claim for breach of the implied duty of good faith and fair dealing.

{¶ 65} In sum, we conclude that the evidence in the record demonstrates that ODNR did not breach the parties' contract, and ODNR is entitled to judgment as a matter of law. The trial court, therefore, erred in granting JDS summary judgment and denying ODNR summary judgment. Accordingly, we sustain ODNR's first and second assignments of error.

{¶ 66} By its third assignment of error, ODNR argues that the trial court erred in awarding JDS specific performance. Our determination that ODNR did not breach the parties' contract renders the remedy issue moot. Accordingly, we do not decide ODNR's third assignment of error.

{¶ 67} For the foregoing reasons, we sustain ODNR's first and second assignments of error, which renders moot the third assignment of error. We reverse the judgment of the Franklin County Court of Common Pleas, and we remand this case to that court so that it may enter summary judgment in ODNR's favor.

*Judgment reversed;*
*cause remanded with instructions.*

SADLER and BRUNNER, JJ., concur.

———————————